UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 05-254 (EGS)** |
| | : | |
| **BARBARA JOAN MARCH,** | : | |
| also known as **BARBARA MCMAHON,** | : | |
| also known as **BONNIE MCMAHON,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following sentencing recommendation and reasons in support of such recommendation:

1. On March 1, 2006, the defendant pleaded guilty to fourteen counts of Mailing Injurious Articles in violation of 18 U.S. Code §§1716(a) and (j)(2). The plea agreement, which was entered pursuant to Fed.R.Crim.P. 11(c)(1)(C), provides for a sentence of fifteen years imprisonment, should the Court accept it. The government requests that the Court accept the plea agreement and sentence the defendant to fifteen years imprisonment, which sentence is at the high end of the applicable Guidelines range.

FACTS

2. On or about April 22, 2005, Barbara Joan March mailed fourteen threatening letters, each containing either a baked good or a piece of candy laced with rat poison, to the Supreme Court Justices, the Director and Deputy Director of the FBI, and the Chiefs of Staff of the Army, Navy and Air Force, at various addresses in Washington, D.C. Each envelope contained a one page typewritten letter stating either "I am" or "We are," followed by "going to kill you. This is

poisoned." Each of the letters bore the handwritten signature(s) of the purported sender(s), whose name(s) and return address were typed both in the body of the letter and on the envelopes. Many of the envelopes bore legible postmarks dated April 22, 2005, in New York, New York.

3. The purported senders of the letters live throughout the country, including in Connecticut, New Jersey, Washington, D.C., Maryland, Florida, Georgia, Illinois and Missouri. The purported senders all are associated with Ms. March, though they are not all associated with each other. Three of the purported senders attended elementary and/or high school with Ms. March; seven attended college with her; one is a former co-worker; one lived with her while the two were studying abroad in Spain; one lived with Ms. March's brother; and one has the same name as her former husband.

4. Numerous handwritten documents recovered in searches of Ms. March's single-room apartment in Bridgeport, Connecticut, reflect that she engaged in considerable planning in order to prepare and send the letters. Many documents were found that bore the name and/or address of one or more of the purported senders. One such document contains a list, numbered one through fourteen, that includes the first name, and in some cases, the first initial of the last name, and the state of residence of each of the purported senders. Numerous maps, printed from internet web sites, were found that bore the addresses of several of the purported senders. One document consisted of an apparent "to do" list with the following entries:

"Find people
a) phone cards
b) call NY library
c) go to library with paper by train
d) phone books
e) U.S. Search
f) wig

g) lease a car
h) insurance
i) a route & a plan
j) type letters
k) candy & tape - no fingerprints - plastic gloves
l) r.p.
m) to Florida
n) practice
o) a storage unit and [illegible]
p) a map"

Numerous other "to do" lists that included similar entries also were found. Many documents contained references to expenses for candy, paper and envelopes, "r.p.," U.S. Search, and trips to New York. One document also made references to "SCJ" and "Army."

5.    The letters have undergone multiple scientific analyses at the FBI Lab in Quantico, Virginia. The edible contents of each letter were analyzed chemically and found to contain rat poison, specifically, bromadiolone.

6.    Of the seven letters analyzed for the presence of fingerprints, no such evidence was found. Of the ten letters analyzed for the presence of DNA, a detectable quantity of DNA was found only on two of the flap seals and corresponding envelope portions. However, the DNA specimens either were not usable or were usable only for exclusionary purposes. These fingerprint and DNA results, as well as the above-referenced "to do" list, indicate that Ms. March took conscious steps to conceal her identity as the true sender of the letters.

7.    The letters and envelopes each were found to have been produced by a typewriter with a carbon ribbon. Three such typewriters were located at a public library in Bridgeport, Connecticut, within a short distance of Ms. March's residence, and the ribbons from those typewriters were recovered on June 30, 2005. Upon laboratory examination, one of those ribbons was found to have

been used to prepare the typewriting on the letters and envelopes addressed to Justices Breyer, Ginsberg, Rehnquist, and Thomas, and on the letter and envelope addressed to Director Mueller.

8.  Numerous fibers were recovered from the nine letters analyzed for the presence of trace evidence, specifically from the tape that was used to seal the envelopes and to affix the baked good or candy to the letters. Several of these fibers were found to be consistent with clothing recovered from Ms. March's residence. Specifically, a red cotton fiber found on the tape affixed to the envelope addressed to Director Mueller is consistent with a shirt recovered from Ms. March's residence; variegated pink-purple cotton fibers found on the tape affixed to the envelope addressed to Justice Stevens and the letter addressed to Justice Ginsburg are consistent with another shirt; a pink animal fur fiber found on the tape affixed to the letter addressed to Deputy Director Pistole is consistent with a sweater recovered from Ms. March's residence; and red ramie fibers found on the envelope addressed to Admiral Clark are consistent with another sweater.

9.  The defendant, through her counsel, timely notified the government of her intention to plead guilty, and thereby permitted the government to avoid preparing for trial and also permitted the government and the Court to allocate their resources efficiently.

10. Prior to entering into the plea agreement, the government advised representatives of each of the intended recipients of the letters of the terms of the agreement to determine whether any had any concerns about the proposed plea. None did. At the Court's request during the plea colloquy, the government has contacted those representatives again to express the Court's reservations that the proposed sentence is not sufficiently punitive, and to determine whether the intended recipients continue to support the plea in light of the Court's reservations. In response, each

of the representatives for the intended recipients has reported to the government that the intended recipients continue to have no objection to the proposed sentence of fifteen years imprisonment.

### Acceptance of Responsibility

11.     In light of the foregoing recitation of the defendant's timely substantial assistance to the government in this investigation, the government requests that the defendant receive an additional one point adjustment for acceptance of responsibility pursuant to §3E1.1(b) of the Sentencing Guidelines.

### Sentencing Recommendation

12.     The Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), ruled that the Sentencing Guidelines are advisory rather than mandatory. However, the Court made clear that in determining the appropriate sentence for a defendant, federal courts still are required to calculate and consider the applicable Guidelines range, refer to the pertinent Sentencing Commission policy statements, and bear in mind the need to avoid unwarranted sentencing disparities and to provide restitution to victims. *Id.* at 259-60. Moreover, in determining an appropriate sentence for the defendant, federal courts also must continue to consider the need for the sentence imposed to accomplish the following sentencing objectives: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. *Id.* at 260; *see also* 18 U.S.C. § 3553(a)(2). The sentence of fifteen years imprisonment proposed in the plea agreement is consistent with the Guidelines and with each of the § 3553 factors.

13. Arguably, the applicable Sentencing Guidelines range is the most important factor the Court can consider in sentencing the defendant in this case because this range is calculated based upon the Sentencing Commission's careful consideration of all of the factors the Supreme Court and Congress have directed courts to consider in sentencing defendants. The applicable Guidelines range in this case reflects an intensive objective analysis of sentences imposed on defendants similarly situated to defendant and is a critical tool to avoid unwarranted sentencing disparities. According to the presentence report, the defendant has an adjusted offense level of 29 and a criminal history category of VI, resulting in a Guidelines range of 151 to 181 months. The agreed sentence of 180 months imprisonment thus is at the high end of the applicable Guidelines range.

14. The agreed sentence also addresses the seriousness of these offenses. Clearly, the defendant's conduct in mailing threatening letters containing poison-laced cookies and candy to high-level public officials was calculated, dangerous, and egregious. The defendant's conduct is particularly troubling in light of her history of engaging in bizarre and violent behavior. Given the Court's concern that the agreed sentence of fifteen years imprisonment may not be sufficiently punitive, the government, without in any way minimizing the defendant's conduct, proffers the countervailing factors that it considered in entering into the plea agreement. First, all of the letters fortunately were intercepted at mail facilities after mail handlers noticed the by-then crushed cookies and candy seeping through the envelopes, and thus none of the letters reached the intended recipients. Second, the threatening statements made in the letters, though undeniably frightening, also warned the intended recipients that the enclosed contents were poisoned. Therefore, it is unlikely that any of the intended recipients would have been harmed even had they received the letters. Third, the defendant's conduct does not appear to have been motivated by any personal,

political or professional animosity toward the intended recipients of the letters. Rather, interviews with the purported senders of the letters, as well as factors cited in the presentence investigation report, suggest that the defendant's conduct likely was motivated by a misplaced anger toward the purported senders of the letters, former friends and colleagues who in the defendant's mind somehow had abandoned or wronged her.[1]  *See* Presentence Investigation Report at ¶88.  The fact that the defendant chose to mail the letters to high-level public officials in a misguided attempt to cause more harm to the purported senders has increased her sentence by approximately five years.[2]  Finally, although the defendant has spent much of the last twenty years in prison, she does appear to have lived a functional, law-abiding life during the seven years between her release from prison in 1998 and the commission of these offenses.  The agreed sentence appropriately and adequately balances the seriousness of the defendant's conduct against these countervailing factors.

15.    The agreed sentence also is a significant term of incarceration that quite clearly sends a message that such offenses will be treated seriously and harshly.  It also protects the intended recipients of the letters, the purported senders of the letters and the public from the defendant, a 60-year old woman who as a result of these convictions will be incarcerated and thereafter under court supervision well into her seventies.

16.    Finally, the agreed sentence provides significant deterrence and just punishment for the defendant, and it places her in a structured environment that can address her particular needs.

---

[1]    Many of the purported senders of the letters personally have witnessed the defendant engage in bizarre or troubling behavior and/or have received threatening letters from the defendant, causing them to discontinue their relationships with her.

[2]    The six-point adjustment for official victims under §3A1.2 of the Sentencing Guidelines increased the defendant's offense level from 23 to 29, a difference of 59 to 73 months imprisonment.

*See* Presentence Investigation Report at ¶88. A sentence of fifteen years imprisonment therefore not only is consistent with the Sentencing Guidelines and Congress's goal in implementing them of ensuring uniformity in sentencing, but also is entirely reasonable, appropriate and necessary to satisfy Congress's other stated sentencing objectives.

WHEREFORE, the United States respectfully requests that the Court accept the plea agreement and impose a sentence of fifteen years imprisonment in this case.

                                        Respectfully submitted,

                                        KENNETH L. WAINSTEIN
                                        United States Attorney
                                        D.C. Bar No. 451058

By:    _____
        ANGELA G. SCHMIDT
        Assistant United States Attorney
        Texas Bar No. 17764980
        Federal Major Crimes Section
        555 4th Street, N.W., 4th Floor
        Washington, D.C. 20530
        (202) 514-7273
        Angela.Schmidt@usdoj.gov